******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MULLINS, J., dissenting. I respectfully disagree with the majority's conclusion that the trial court improperly rendered summary judgment on the ground of governmental immunity. I generally agree with the facts set forth by the majority and need not recite them again. I disagree, however, with the majority's analysis and conclusion on what constitutes the dangerous condition and imminent harm in this case. Accordingly, I dissent.

In this case, the plaintiff, Bernadine Brooks, administratrix of the estate of Elsie White, filed a six count amended complaint, in which she alleged negligence against the defendants Robert Powers and Rhea Milardo, two constables who were employed by the defendant town of Westbrook (town),[1] and counts of vicarious liability and indemnification against the town.[2] In her amended complaint, the plaintiff alleged, in relevant part:

"8. Sometime between the evening of June 18, 2008, and the morning of June 19, 2008, the decedent, Elsie White, a resident of Westbrook, Connecticut, tragically died in the water along the shore of Westbrook.

"9. Upon information and belief, on the evening of June 18, 2008, Officers Powers and Milardo were scheduled to work marine patrol. When they arrived for duty, however, there was a severe storm, including heavy rain, thunder and lightning. As such, they determined the weather was too severe for marine patrol along the shore and accordingly resumed patrol inland in the town of Westbrook.

"10. Upon information and belief, on June 18, 2008, at approximately 7:50 p.m., Officers Powers and Milardo stopped at a gas station/convenience store in . . . Westbrook in order to put on their rain gear.

"11. While at the gas station/convenience store, Officer Powers was approached by Ms. Kimberly Bratz . . . . Ms. Bratz alerted Officer Powers that an individual (later determined to be the decedent) . . . was standing in a field along the shore with her arms outstretched and looking into the sky in the middle of severe weather. Further, Ms. Bratz reported the individual's location and expressed concern because of the individual's unusual behavior.[3]

"12. Thereafter, Officer Powers contacted Dispatcher [Theresa] Smith with this information and requested that she send an officer to the individual's location. Officer Powers explained that because he and Officer Milardo were working on the marine patrol boat . . . they could not respond to the location. In actuality, however, Officers Powers and Milardo were not patrolling on the boat and were available to respond.

"13. Once obtaining the information from Officer Powers, Dispatcher Smith failed to enter the call for services in the computer automated dispatch . . . system as requested, failed to dispatch one of several constables working in Westbrook and a patrol trooper, who were available at that time and could have responded if dispatched, and failed to take any further action.

"14. Having received no care or intervention as a result of Dispatcher Smith's failure to log the call or dispatch a police officer, and Officers Powers' and Milardo's failure to be truthful and satisfy their roles as constables, Ms. White lingered in her unstable condition and later died (due to drowning) in the water off the shore of Westbrook." (Footnote added.)

As a result of these alleged acts, the plaintiff claimed that the defendants, acting in their official capacities, were negligent and liable for the death of White (decedent). The defendants filed an answer and several special defenses, including governmental immunity pursuant to the common law and General Statutes § 52-557n. The plaintiff filed a general reply to the special defenses.[4]

On April 3, 2014, the defendants filed a motion for summary judgment on grounds including lack of proximate cause and governmental immunity. Along with the memorandum of law in support of their motion, they filed many exhibits, including portions of depositions and a supplemental police report concerning the decedent's untimely death.[5] The plaintiff timely filed an objection, claiming that the defendants had failed to prove that there existed no genuine issues of material fact, that the defendants' duty was ministerial, and that the decedent was an identifiable person, subject to imminent harm.[6] The plaintiff also filed a memorandum of law in support of her objection, along with several exhibits.

The trial court rendered summary judgment in favor of the defendants in a July 23, 2014 memorandum of decision, concluding that the defendants' acts were discretionary and that the plaintiff's claims did not fall within an exception to the doctrine of governmental immunity. Specifically, the court found, in relevant part: "The evidence submitted establishe[d] the absence of a genuine issue of material fact that the harm to which the decedent was ultimately exposed, drowning in Long Island Sound, was not apparent to the defendants in this case. The defendants were made aware only that the decedent was standing in a field during a severe storm on the night before her death, and that she may have been in need of medical attention. Moreover, the subject harm to which the decedent was exposed, drowning, was not limited in duration and geographic scope, as it could have occurred at any time in the future or not at all. The uncontroverted evidence submitted

demonstrates that the decedent drowned the next morning in Long Island Sound, although she was initially reported to be located in a field on Route 1 on the previous night. Under the allegations of the plaintiff's complaint, and the evidence presented, the identifiable victim, imminent harm exception does not apply in this case."

The court also determined that "the evidence presented demonstrates the absence of a genuine issue of material fact that [the defendants] were not aware that their discretionary acts of failing to investigate and respond to the complaint made by Bratz exposed the decedent to imminent harm by drowning [in Long Island Sound]." Accordingly, the court rendered summary judgment in favor of the defendants. The plaintiff thereafter filed a motion to reconsider and reargue, which the court denied. This appeal followed.

The plaintiff contends that the court improperly rendered summary judgment in this case because it weighed facts, it overlooked the fact that the defendants lied to avoid their duty, it improperly looked to facts that arose after the defendants refused to act, and it "either applied the incorrect standard as to imminent harm or construed the scope of the harm to which the plaintiff was exposed too narrowly." Unlike the majority, I would conclude that the trial court properly rendered summary judgment on the ground of governmental immunity.

I begin with the standard of review applicable to this case. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary. . . .

"[T]he ultimate determination of whether qualified immunity applies is ordinarily a question of law for the court . . . [unless] there are unresolved factual issues material to the applicability of the defense . . . [where the] resolution of those factual issues is properly left to the jury. . . . [Where] the material facts . . . are undisputed . . . we exercise plenary review over the trial court's determination that the defendant is entitled to qualified immunity as a matter of law." (Citations omitted; internal quotation marks omitted.) *Coley* v. *Hartford*, 312 Conn. 150, 160, 95 A.3d 480 (2014).

The following principles of governmental immunity are pertinent to the resolution of the plaintiff's claims. "The [common-law] doctrines that determine the tort liability of municipal employees are well established. . . . Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts.

. . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts . . . because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"There are three exceptions to discretionary act immunity. Each of these exceptions represents a situation in which the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force. . . . First, liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness or intent to injure. . . . Second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws. . . . Third, liability may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ." (Citations omitted; internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 318–20, 907 A.2d 1188 (2006). The only exception at issue in this case is the imminent harm exception.

"The imminent harm exception to discretionary act immunity applies when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . . By its own terms, this test requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim *to that harm*." (Emphasis added; footnote omitted; internal quotation marks omitted.) Id., 329.

Our Supreme Court previously has explained that

"this exception to the general rule of governmental immunity for employees engaged in discretionary activities has received very limited recognition in this state. . . . If the plaintiffs fail to establish any one of the three prongs, this failure will be fatal to their claim that they come within the imminent harm exception." (Citation omitted; internal quotation marks omitted.) Id.

Here, although the plaintiff frames her claims around the fact that the defendants lied to Smith, the question facing this court is whether the trial court properly rendered summary judgment in favor of the defendants on the ground of governmental immunity, not whether the actions of the defendants were egregious.[7] The parties do not dispute that the decedent was an identifiable victim, and the court also found as such. I, therefore, will look to the remaining prongs, namely, whether the decedent was subject to imminent harm and whether it was apparent to the defendants that their conduct likely would subject the decedent *to that harm*. See id.

To start, I examine whether the decedent was subject to imminent harm, which necessarily must be caused by a dangerous condition, and whether it was apparent to the defendants that their conduct likely would subject the decedent to that imminent harm. See *Williams* v. *Housing Authority*, 159 Conn. App. 679, 705, 124 A.3d 537 (plaintiff must first establish that dangerous condition *alleged to have harmed* identifiable person was apparent to municipal defendant), cert. granted on other grounds, 319 Conn. 947, 125 A.3d 528 (2015); see also *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014).[8]

In *Williams*, we opined that our Supreme Court, in *Haynes*, had modified the identifiable person subject to imminent harm test, and that the test could now be interpreted to have four prongs rather than three. "First, the dangerous condition alleged by the plaintiff must be apparent to the municipal defendant. . . . We interpret this to mean that the dangerous condition must not be latent or otherwise undiscoverable by a reasonably objective person in the position and with the knowledge of the defendant. Second, *the alleged dangerous condition must be likely to have caused the harm suffered by the plaintiff. A dangerous condition that is unrelated to the cause of the harm is insufficient to satisfy the Haynes test*. Third, the likelihood of the harm must be sufficient to place upon the municipal defendant a clear and unequivocal duty . . . to alleviate the dangerous condition. The court in *Haynes* tied the duty to prevent the harm to the likelihood that the dangerous condition would cause harm. . . . Thus, we consider a clear and unequivocal duty . . . to be one that arises when the probability that harm will occur from the dangerous condition is high enough to necessitate that the defendant act to alleviate the defect. Finally, the probability that harm will occur must be so high as to

require the defendant to act immediately to prevent the harm.

"All four of these prongs must be met to satisfy the *Haynes* test, and our Supreme Court concluded that the test presents a question of law." (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) *Williams* v. *Housing Authority*, supra, 159 Conn. App. 705–706.

In this case, the plaintiff and the majority seem to imply that the dangerous condition was the severe storm on the night of June 18, 2008, and that the decedent suffered an imminent harm as a result thereof. The fact remains, however, that the decedent died on the night of the storm or in the early morning of June 19, 2008, from drowning in Long Island Sound, which was approximately one-half mile from the field in which she was seen during the severe storm. There also are no facts alleged in the pleadings or presented in the record that tie her drowning to the storm and her presence in the field. She did not drown in the field, nor was she struck by lightning or injured in the field as result of the storm, i.e., struck by a downed tree limb, flying debris, etc.

Additionally, nothing in the record or in the pleadings indicates that the defendants knew that the decedent would accidentally drown after she ventured from the field to the Long Island Sound. Although the storm may have been a dangerous condition that *could have* subjected the decedent to harm, the zone of such harm is not limitless. The harm suffered must be related to the dangerous condition. See id., 706. In my view, the general risk of harm presented by standing in the middle of a field during a severe storm is too attenuated from the harm that the decedent suffered, which was drowning later that night or the next morning in the Long Island Sound, approximately one-half mile away from that field. Thus, the nexus between the alleged dangerous condition here and the imminent harm actually suffered by the decedent simply is not there.

As to imminent harm, our Supreme Court recently explained that "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm." *Haynes* v. *Middletown*, supra, 314 Conn. 322–23. Obviously, the harm that was suffered by the decedent in this case was her tragic death by drowning in Long Island Sound. I cannot ascertain, however, how that harm was imminent when the decedent was in the field and the defendants were notified that she needed medical help, or how that imminent harm was or should have been apparent to the defendants.

It appears to me that the plaintiff and the majority

are viewing imminent harm far too broadly. In their view, the plaintiff can demonstrate a dangerous condition and imminent harm simply by showing that the defendants knew that the decedent was standing in the middle of an open field during a severe storm, in need of medical attention, and that the defendants failed to go to the field. Once they failed to act by going to the field,[9] any harm, no matter how far removed, becomes the defendants' responsibility, and the plaintiff does not have to establish that the specific harm suffered by the decedent was the specific harm of which the defendants were aware. My view of the law is otherwise. See *Doe* v. *Petersen*, 279 Conn. 607, 620–21, 903 A.2d 191 (2006) ("[a]n allegedly identifiable person must be identifiable as a potential victim of a *specific imminent harm*" [emphasis added]).

Stated simply, the majority has identified *a dangerous condition* and the potential for harm from that dangerous condition, but has not identified *the dangerous condition* that actually *caused the harm* to the decedent or how the defendants knew of it. In my view, to survive summary judgment the plaintiff must allege specifically the dangerous condition that *actually caused* the injury to the decedent, not simply that a dangerous condition existed, which *potentially* could have harmed the decedent, and that an injury then resulted. See id. My disagreement with the majority centers on the fact that there is no nexus between the alleged dangerous condition (the storm), the potential imminent harm to which the decedent would be subjected from that dangerous condition (being struck by lightning, debris, etc., while in the field), and the actual harm suffered (drowning sometime later that night or the next morning approximately one-half mile away from where she was last seen).

Thus, even accepting all the facts as set forth by the plaintiff in this case, she has failed to provide any nexus between the decedent's death by drowning in Long Island Sound, the storm, and the conduct of the defendants in not checking on her when she was in the field and they had been told that she was in need of medical attention. Aside from the generalized danger the storm may have posed to the decedent while she was in the field, I do not see the specific dangerous condition that the plaintiff is alleging to be the cause of decedent's death. See *Williams* v. *Housing Authority*, supra, 159 Conn. App. 705–706 (alleged dangerous condition must be likely to have caused harm suffered by identifiable person); see also *Haynes* v. *Middletown*, supra, 314 Conn. 322–23.

The plaintiff's contention that once the defendants failed to respond to the decedent's need for medical help, any harm that befell the decedent after their failure to act, no matter how attenuated from the dangerous condition, was imminent harm of which the defendants

were aware is inconsistent with our precedent.[10] Under our law, the general nature of the harm must have some connection to the harm actually suffered. See *Doe* v. *Petersen*, supra, 279 Conn. 620–21.

In other words, just establishing a dangerous condition, in this case, the storm, does not mean that any harm that befell the decedent was a result of that dangerous condition and that the defendants were aware that their failure to respond would put the decedent at risk of any and all possible harm she could have suffered thereafter. Thus, the decedent standing in the storm was not so likely to cause the harm that she suffered that the defendants had a clear and unequivocal duty to act. Indeed, there is not even an allegation, let alone any factual basis submitted in opposition to the defendants' motion for summary judgment, that would indicate that the specific harm suffered by the decedent was even remotely connected to her standing in the open field during the storm.

On the basis of the foregoing analysis, I would affirm the judgment of the trial court and conclude that it properly rendered summary judgment on the ground of governmental immunity.

Accordingly, I respectfully dissent.

[1] Because the matter at issue in this appeal is whether liability can be imposed against Powers and Milardo, the derivative liability of their employer, the town, which would be coextensive with that of Powers and Milardo, is not at issue here. I therefore refer in this opinion to Powers and Milardo as the defendants.

[2] In her original complaint, the plaintiff also had named as a defendant Theresa Smith, a dispatcher for the state police, alleging that she was negligent. Smith filed a motion to dismiss the complaint as to her on the ground of sovereign immunity. The plaintiff then withdrew her claim as to Smith and filed an amended complaint.

[3] In her deposition, which was submitted as exhibit C to the defendants' memorandum of law in support of their motion for summary judgment, Bratz stated that she knew the decedent, although she had never met her, because the decedent lived at the Ambleside apartment complex as did Bratz' mother. She also explained that, on the night of June 18, 2008, between approximately 7:30 and 8 p.m., during a thunder and lightning storm, she and her husband drove by the apartment complex as they returned from Old Saybrook, when she saw the decedent on the other side of Route 1, in a field, where there were no homes. She stated that it was still light out at the time, so she could see and identify the decedent, who was not wearing rain gear or carrying an umbrella, but was dressed in pants and a shirt. The grass in the field was approximately knee high, and the decedent was standing in the middle of the field with her hands raised to the sky.

[4] Practice Book § 10-57 provides: "Matter in avoidance of affirmative allegations in an answer or counterclaim shall be specially pleaded in the reply. Such a reply may contain two or more distinct avoidances of the same defense or counterclaim, but they must be separately stated."

Although Practice Book § 10-57 requires that matters in avoidance be specially pleaded in the plaintiff's reply, the defendants did not object to the plaintiff raising this matter in her objection to the motion for summary judgment. We note that our Supreme Court previously has afforded the trial court "discretion to overlook violations of the rules of practice and to review claims brought in violation of those rules as long as the opposing party has not raised a timely objection to the procedural deficiency." *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 273, 819 A.2d 773 (2003).

[5] In the supplemental police report, the investigating state police trooper, Eric Kelly, averred that he had attended the autopsy of the decedent and that the medical examiner had ruled the decedent's cause of death as an

accidental drowning. Trooper Kelly also averred that he had clocked the relevant distances related to this incident: "From the entrance to Ambleside Apartments straight down Old Salt Works Road to the water is four-tenths (4/10) of a mile. From the entrance of Ambleside Apartments, traveling East on Route 1, and turning South on Old Kelsey Point Road to the water is six-tenths (6/10) of a mile. From the entrance to Ambleside Apartments, traveling West on Route 1 to the field next to Old Forge Road is one-tenth (1/10) of a mile. From the field next to Old Forge Road, traveling West on Route 1 to the Valero Gas Station at the intersection of Route 1 and Salt Island Road is seven-tenths (7/10) of a mile." I see nothing in the record that contradicts these distances. Thus, it is uncontested that the distance between the field on Route 1, near the Ambleside Apartments, where Bratz saw the decedent, and the water, was somewhere between four-tenths of one mile and six-tenths of one mile.

[6] On appeal, the plaintiff has waived her claim that the defendants' actions or inactions were ministerial in nature.

[7] I, in no way, seek to diminish the egregiousness of the defendants' actions in this case and, like the majority, am appalled by the conversation Powers had with Smith. This case, however, concerns whether the decedent was subject to imminent harm and whether it was apparent to the defendants that their conduct likely would subject the decedent to *that harm*. This case was brought against the defendants in their official capacities and does not allege any personal liability.

[8] The trial court rendered judgment in the present case before the publication of the appellate decisions in either *Williams* or *Haynes*.

[9] I emphasize at this point that the plaintiff has conceded that the defendants had no ministerial duty here.

[10] The majority cites to *Ruiz* v. *Victory Properties*, *LLC*, 315 Conn. 335, 107 A.3d 381 (2015), for the proposition that all that is required is the general nature of the harm and that it does not matter if the harm occurs in a bizarre way. Although I agree with this proposition, I conclude that the harm that befell the decedent in this case was not harm that occurred in a bizarre way, but, rather, was harm that was unrelated to the dangerous condition or the potential for imminent harm to which she was subjected in the field.

---